IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN DOE,** )<br>)<br>Plaintiff )<br>)<br>V. )<br>)<br>**ALBANY MEDICAL COLLEGE,** )<br>)<br>)<br>Defendants. )<br>_____ ) | Case No.  1:16-CV-1322 (BKS/DJS) |

## VERIFIED COMPLAINT

John Doe[1], by and through his undersigned attorney, files this complaint for gender-based discrimination in violation of Title IX (20 U.S.C. § 1681), breach of contract and common law negligence including negligence per se and negligent training and supervision. In support of this complaint, John Doe states as follows:

## PARTIES

1. Plaintiff John Doe was, at all times relevant to this complaint, a citizen of the State of Pennsylvania.

2. Defendant Albany Medical College ("AMC") is a private medical college incorporated and with its principal place of business located in the County of Albany, State of New York.

## JURISDICTION AND VENUE

3. The Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 and under laws of the United States, including Title

---

[1] "John Doe" is not the plaintiff's real name. Due to the nature of the lawsuit, in order to protect the privacy of the plaintiff, he will proceed under the pseudonym John Doe.

1

IX of the Education Amendments of 1972, 20 U.S.C. §§1681-88. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as Mr. Doe is a citizen of the State of Pennsylvania and the defendant is located in the State of New York. The state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

4. Venue properly lies in this Court under 28 U.S.C. §1391. The Defendant is a private medical school, incorporated in and with its principal place of business in the State of New York, and is considered to reside in this judicial district. In addition, the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## STATEMENT OF FACTS

5. Between August 2015 and October 2016, Mr. Doe was a medical student at Albany Medical College in Albany, New York. John Doe was charged with violating Albany Medical College's student conduct policy based upon allegations he committed sexual assault against another student. After a hearing on September 14, 2016, it was recommended that Doe be expelled from Albany Medical College, a decision that was upheld on October 21, 2016 after an appeal. Unless this decision is overturned, the sentence will remain a part of the Plaintiff's permanent educational records and will substantially limit his ability to transfer to another institution or secure future employment in his chosen profession of medicine.

6. After completing his undergraduate studies, and then a master's degree, he began his matriculation at Albany Medical College in August 2015, where he was a classmate with Ms. Jane Roe.[2]

---

[2] Not her real name; an alias is used to protect her identity.

2

7. On June 4, 2016, John Doe, having just completed his first year of studies at AMC, was accused of various sexual misconduct violations by Jane Roe during the late night hours of June 3 into the early morning of June 4, 2016.

## COLLEGE POLICIES AND PROCEDURES

8. AMC has written guidelines that govern how it should handle allegations of wrongdoing by its students titled <u>Albany Medical College Student Non-Discrimination and Harassment Policy, and Complaint Procedure</u> (the "Handbook"). It was promulgated in its current form prior to the events in question and was in full force and effect during the investigation, hearing and appellate procedures.

9. The policies contained in the Handbook are part of the contract under which the student and the school agree to be bound during the student's matriculation.

## THE INCIDENT

10. Doe and Roe, along with a group of their classmates, were celebrating the end of another academic year the night of June 3, 2016.

11. At Roe's apartment, around ten pm, students including Doe and Roe were drinking.

12. From there, they travelled in a group to a local bar, known as The Pub, on Madison Avenue in Albany, New York. Throughout the night, Roe had made several flirtatious passes at Doe, continuing behavior from prior evenings that was indicative of her romantic interest.

13. Their drinking continued until about one am, at which point, Doe, Roe and others left the bar to get a bite to eat.

14. Doe and Roe shared a plate of fried rice before travelling, with at least one other person, back to Roe's apartment, which was located between Doe's apartment and the restaurant.

15. Plaintiff, who was both mildly intoxicated and tired from a long day, fell asleep on Roe's couch upon their arrival at the apartment. When he woke up about ten minutes later, Roe was alone and in the kitchen. When he went in to talk to her, their conversations quickly turned into kissing.

16. During a brief pause, Roe stated that she had a boyfriend (who was not John Doe), and Doe asked "what's cheating?" to which Roe replied "sex." Doe then asked "everything else is okay?" to which Roe replied, both verbally and by nodding her head, in the affirmative.

17. Roe then took the Plaintiff by the hand and moved to her couch. After a few more minutes of kissing, Plaintiff moved—with Roe's verbal consent—to unbutton her pants and commence manual stimulation of her vagina.

18. After a few more minutes, Roe stood up and went to the bathroom. At that point, she began texting her friends to come over to her apartment.

19. When she emerged from the bathroom, Doe and Roe did not continue with their sexual activity. Having a sobering moment apart, realizing that they were engaged in cheating on Roe's boyfriend, they then sat on separate couches and spoke for a few minutes until her friends showed up.

20. When the friends arrived, the group hung out for a bit until Doe decided it was time to walk home. As he left, Roe hugged him and said goodbye.

21. After arriving home, Plaintiff, who felt remorse about being "the other man" in a relationship, texted Ms. Roe to apologize; she responded immediately and wrote "It's okay good night!!"

## THE INVESTIGATION

22. The investigation commenced on or about June 7, 2016 and was conducted by Noel Hogan, AMC's Chief Compliance Officer.

23. The investigation began after Roe had become increasingly upset on June 4, 2016, after talking to her boyfriend and admitting to the events of the night before.

24. The afternoon of June 4, 2016, Roe went to St. Peter's Hospital Urgent Care Center. A sexual assault nurse examination ("SANE") was completed. After that, the case was reported to the Albany Police Department.

25. As of the filing of this complaint, the Albany Police, despite conducting a full investigation, have declined to bring charges against Mr. Doe.

26. AMC began its investigation after being apprised by various members of its staff that a report had been filed with the Albany Police Department.

27. The school's investigation, which was completed and reported to the Plaintiff on August 31, 2016, concluded that Mr. Doe had engaged in certain sexual acts without the affirmative consent of the Ms. Roe.

28. This investigation concluded that, because she was intoxicated, Ms. Roe was unable to consent.

29. The conclusions drawn in the investigation relied upon a flawed interpretation of the legal standard of "physical helplessness." The investigation concluded that Ms. Roe could not give consent because she was physically helpless, which was in direct contradiction to the evidence found by the investigator. She was awake, alert, and engaged throughout the night.

30. Again, the investigation minimized contravening facts, including Ms. Roe's recollection of the events of the night, demonstrating that she suffered no blackouts and was awake and alert enough to send text messages to others during the incident and, after the events

in question, sit and have a full-length conversation with a group of people. She was neither unconsciousness nor physically helpless at any point that night while in the presence of the Plaintiff.

31. The investigation minimized or outright ignored Ms. Roe's fabrication of events on the night in question. For example, she recounted that she remembered that she was yelling and screaming at the Plaintiff while they were in her apartment together, whereas other people who were present directly contradicted her and said, in fact, that she was friendly and hugged the Plaintiff before he left the apartment.

32. In order to explain the obvious gap in this theory of liability, the investigation softened the standard to fit the facts, even though Ms. Roe was awake and alert throughout the night. In order to make up for such deficiencies, the investigation muddled two separate and distinct theories of sexual assault – physical helplessness and forcible compulsion, hoping that the specter of force (itself bearing a high threshold for proof and not met here) would be enough to justify its conclusions.

33. AMC spent the majority of the summer working on the report and turned it over the Mr. Doe the day before the Labor Day weekend, leaving less than ten days to prepare for a hearing to decide his fate.

34. The Plaintiff was advised that any attempt to talk to potential witnesses could be found to be a violation of AMC's Honor Code, which would itself constitute another basis for disciplinary measures. Such a warning had a chilling effect and deprived the Plaintiff of an avenue to defend himself of the allegations.

## THE HEARING

35. Prior to the hearing, Doe's parents met with Dr. Henry Pohl, the Vice Dean for Academic Administration. He was one of the main characters throughout the investigation, hearing and appeal.

36. On September 9, 2016, Doe's parents, who attempted to advocate on behalf of their son and his future, were told by Dr. Pohl that the outcome of the hearing had been pre-determined because, in his words, "in these types of cases we have to side with the woman because of Title IX," or words to that effect.

37. Prior to the commencement of the hearing, Plaintiff was told a number of different formats for the procedure.

38. On Tuesday, September 13, 2016 at 3:48 PM, the evening before the hearing, Dr. Pohl emailed Mr. Doe and said "You might want to come to my office after 5PM to view the medical report. You can only read it and no copies can be made. Let me know if you want to do this. Call my cell: xxx-xxxx."[3] That is, even though Dr. Pohl had the medical report of Ms. Roe for weeks, the only offer to review it was made the night before the hearing. Further, nothing was made available the day of the hearing, despite numerous requests by Mr. Doe.

39. On Tuesday, September 13, 2016, Dr. Pohl told Doe that, at the beginning of the hearing, he would be given ten minutes to recount his version of events from the night. Doe was instructed that the committee would then ask questions based on his statement and the data they have reviewed. That was not the procedure followed.

40. The hearing panel was constructed of members of the faculty and staff of AMC as well as a medical student.

---

[3] Pohl's phone number has been redacted in order to protect his privacy.

7

41. At the hearing, conducted on September 14, 2016, Ms. Roe was given the opportunity to give an opening statement first; it lasted the better part of thirty-five minutes and deviated significantly from her prior statements. Despite glaring contradictions and embellishments from prior statements, her version of events was barely questioned and she was excused.

42. Mr. Doe was allowed to speak briefly after that. He was subjected to a series of cross-examination questions from the committee, drilling down to such substantive issues as the perceived length of his fingernails. He was questioned at length about minor inconsistencies between his testimony and his previous written statements.

43. Mr. Doe, despite being told that he would be able to cross-examine his accuser, was not given the opportunity to do so. He did provide questions to the panel conducting the examination, but they asked questions at their discretion. Many of the submitted questions, which could have demonstrated Roe's motives to fabricate and draw out contradictions between her evolving version of events, were ignored.

44. The panel called other witnesses who testified on behalf of his accuser. Page 20 of the Handbook states that "both the Responding Student and the Reporting Individual have the right to question each witness." Mr. Doe was not given the opportunity to cross-examine these witnesses after their testimony, despite written guidelines in the Handbook that allow for such questions.

45. After the committee changed the opening sequence, and the procedures of the hearing itself, they then changed the closing procedures. The Plaintiff was told, prior to the hearing, that he would have an opportunity to give a closing statement and then an impact statement; he was told, as he came in the room for the closing argument, that those two statements would be combined into one. Specifically, when he was called in for his closing

statement after all of the witnesses had spoken, the chair of the committee looked at Mr. Doe and said that he could only make my impact statement, but to "make it brief," "less than five minutes" because "we have already made up our mind."

46. On September 15, 2016, the committee hearing the matter issued its recommendation to Doctor Vincent Verdile, the Dean of Albany Medical College. They found enough evidence to support the allegations of sexual assault and recommended expulsion.

## THE APPEAL

47. After receiving the recommendation of the panel, Mr. Doe was offered the chance to appeal his decision to the Committee on Student Appeals, headed by Dr. Kevin Roberts, another employee of defendant AMC.

48. The Handbook promises specifically that "A record or transcript will be made of the hearing and the student has the right to review such a record or to obtain a copy of such record upon payment of the cost of its reproduction." Despite repeated requests, Mr. Doe was denied a copy of the transcript of the hearing, which was taken in full by a stenographer.

49. The Committee on Student Appeals allowed the appeal only on very specific questions, each of which they asked to be answered without the benefit of a transcript.

50. On October 21, 2016, the Committee upheld the findings supporting allegations of sexual assault and the recommendation of the panel to expel the Plaintiff.

## COUNT I — BREACH OF PROMISED DISCIPLINARY PROCEDURES

51. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

52. At all times relevant hereto, a contractual relationship existed between AMC and Plaintiff. The college's Handbook was a part of that contract. Under that contract, the college

was required to act in accordance with its Handbook in resolving complaints of violations of the Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals challenging a disciplinary panel's determination.

53. AMC breached this contract with Plaintiff by failing to comply with the Handbook in at least the following ways:

   a. Failing to find Plaintiff guilty only if a preponderance of the evidence showed him to be, in violation of the Handbook;

   b. Failing to provide Plaintiff an investigation and hearing free of interference, and failing to remedy such interference, in violation of procedures set out in the Handbook.

   c. Failing to apply the definition of "consent" either in the Handbook or under the law, and implying instead a definition of "consent" not found in AMC's publications or the law.

   d. Failing to provide fair and equitable treatment of the parties during the investigation and hearing, in violation of Handbook.

   e. Failing to provide Plaintiff all of the evidence it used for the hearing, including medical reports of Ms. Roe.

   f. Failing to follow its stated guidelines for the appellate process.

54. As a direct and proximate result of the AMC's breach, Plaintiff has been seriously and irreparably damaged in the following ways, among others: (1) the time Plaintiff spent participating in the investigation and preparing for his hearing instead of continuing his studies will have a serious and permanent effect on his academic achievement, decreasing his ability to continue his studies and find gainful employment in the medical profession; (2) the disciplinary records now contained in Plaintiff's educational file as a result of this make it difficult, if not

impossible, for Plaintiff currently to obtain certain types of employment or be admitted to other medical schools at which he would otherwise be competitive, requiring that he either settle now for inferior options or wait until his file is purged of this erroneous result; (3) Plaintiff will experience a lifetime based on the inferior career prospects that will be available to him due to the fact that this disciplinary violation will make him less competitive at other schools and preferred employers; and (4) Plaintiff will experience emotional suffering and embarrassment from having to explain to future schools, employers and licensing boards, for at least the next several years, why his file contains records indicating that he was found responsible for sexual misconduct.

55. For all of these reasons, AMC is liable to Plaintiff for breach of contract and all damages arising out of that breach.

## COUNT II —BREACH OF CONTRACT

56. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

57. At all times relevant hereto, a contractual relationship existed between Albany Medical College and Plaintiff. AMC's Handbook was a part of that contract. Under that contract, AMC was required to act in accordance with its Handbook in resolving suspected violations of the Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals challenging the disciplinary panel's determination.

58. AMC breached these promises to Plaintiff by failing to comply with the Handbook in at least the following ways:

a. Failing to find Plaintiff guilty only if a preponderance of the evidence showed him to be, in violation of the Handbook;

b. Failing to provide Plaintiff an investigation and hearing free of interference, and failing to remedy such interference, in violation of the Handbook.

c. Failing to apply the definition of "consent" provided in "consent" either in the Handbook or under the law, and implying instead a definition of "consent" not found in AMC's publications or the law.

d. Failing to provide fair and equitable treatment of the parties during the investigation and hearing, in violation of the Handbook.

e. Failing to administer a sanction that was not excessive.

f. Failing to provide Plaintiff a new hearing upon making showings of error on appeal, in violation of stated appellate procedure.

59. As a direct and proximate result of the AMC's failures, Plaintiff has been seriously and irreparably damaged in the following ways, among others: (1) the disciplinary records now contained in Plaintiff's educational file as a result of this make it difficult, if not impossible, for Plaintiff currently to obtain certain types of employment or be admitted to certain schools at which he would otherwise be competitive, requiring that he either settle now for inferior options or wait until his file is purged of this erroneous result; (2) Plaintiff will experience a lifetime reduction in earning potential based on the inferior career prospects, likely outside of medicine, that will be available to him due to the fact that this disciplinary violation will make him less competitive at other medical schools and preferred employers; and (3) Plaintiff will experience emotional suffering and embarrassment from having to explain to future employers and graduate schools, for at least the next several years, a gap in attendance, and (b)

why his educational file contains records indicating he was found responsible for sexual misconduct.

60. For all of these reasons, AMC is liable to Plaintiff for breaching the disciplinary procedures promised to Plaintiff, and all damages arising out of that breach.

## COUNT III —NEGLIGENCE

61. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

62. In its interactions with Plaintiff, in its adoption and implementation of the Handbook, and in conducting its investigation and adjudication of Jane Roe's complaint, AMC owed a duty to Plaintiff to exercise reasonable care, with due regard for the truth, established procedures, and the important and irreversible consequences of its actions, in addition to Plaintiff's various liberty and property rights and interests generally.

63. At all times relevant to this Complaint, Dr. Noel Hogan was the head of the AMC Compliance Office.

64. Dr. Hogan investigated Jane Roe's complaint on behalf of AMC.

65. Dr. Hogan failed to challenge Roe on the inconsistencies in her statement, including her statements that she was somehow physically helpless but still awake and aware enough to engage in conversations with other people, send text messages to friends and break off any and all sexual activity with the Plaintiff in order to go to the bathroom.

66. After obtaining contradictory evidence, Dr. Hogan failed to verify whether Roe's statements therein were consistent with what she alleged to in her statement, and/or failed to confront Roe about any inconsistencies or discuss them with any other administrator or staff member involved in the investigation or adjudication of Roe's complaint.

67. The Handbook also obligates the Dean(s) of Students to ensure committee members have received training in the Sexual Misconduct Policy and the Complaint Procedures.

68. The Dean(s) had an obligation to ensure that Plaintiff's committee members received instruction on the Sexual Misconduct Policy's definition of "physical helplessness," and specifically on the conditions that, under the law, fit the criteria for "physical helplessness."

69. Because of their inadequate training or supervision, the committee equated "physical helpless" with intoxication.

70. Because of their inadequate training or supervision, the committee failed to apply the proper legal standard or definition to support the allegations of wrongdoing by Mr. Doe.

71. AMC's failure to properly train the committee members directly and foreseeably caused injury to Plaintiff, including by causing the committee to find that, despite her professed agreement to engage in sexual relations with Plaintiff, she must not have consented to those encounters because she was intoxicated.

72. AMC gave Plaintiff notice of his committee hearing on August 31, 2016, two days before the start of Labor Day weekend.

73. AMC did not allow Plaintiff reasonable opportunities to review evidence or talk to witnesses.

74. Through the acts set forth above, AMC, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties, mischaracterized the truth, and facilitated a process that violated Plaintiff's rights and other protected interests.

75. As a direct and proximate result of AMC's negligence, carelessness, and breach of due care, Plaintiff will suffer financial losses, including but not limited to lost earning potential due to his inability to be admitted to other medical schools, earn the title and licensing

as a doctor or hired for positions, for which he was eligible before the disciplinary hearing but is no longer.

76. As a further direct and proximate result of AMC's negligence, carelessness and breach of due care, Plaintiff also has suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

77. Accordingly, AMC is liable to Plaintiff for negligence and for all damages arising therefrom.

## COUNT IV — NEGLIGECE PER SE

78. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

79. Upon information and belief, AMC receive federal funding, including in the form of federal student loans given to students.

80. The Higher Education Act of 1965, as amended by the 2013 reauthorization of the Violence Against Women Act, states that both the accuser and the accused in campus disciplinary proceedings have the right "to be accompanied to any related meeting or proceeding by an advisor of their choice." 20 U.S.C. $ 1092{f}{8}(B)(iv)(II).

81. The draft regulations implementing that amendment expressly state that this right includes the right to have an attorney as one's advisor. See 79 Fed. Reg. 35445-46.

82. The Attorney was not allowed to speak or participate in any meaningful way throughout the process.

83. By restricting Plaintiff's choice of advisor, AMC carelessly, improperly, and negligently breached a duty it owed to Plaintiff.

84. Plaintiff was directly and foreseeably harmed by AMC's carelessness and negligence, in that the denial of the assistance of an attorney prevented him from effectively marshaling evidence and argument in his defense, evidence and argument that he was required to collect and construct on a compressed time schedule amid his academic commitments.

85. As a direct and proximate result of AMC's negligence, carelessness, and breach of due care, Plaintiff will suffer financial losses, including but not limited to lost earning potential due to his inability to be admitted to other medical schools, earn the title and licensing as a doctor or hired for positions, for which he was eligible before the disciplinary hearing but is no longer.

86. As a further direct and proximate result of AMC's negligence, carelessness and breach of due care, Plaintiff also has suffered and will continue to suffer from mental and emotional injuries, all of which are permanent in nature, for which compensation is warranted.

87. Accordingly, AMC is liable to Plaintiff for negligence per se and for all damages arising there from.

## COUNT V — VIOLATION OF TITLE IX 20 U.S.C. 1681

88. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

89. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

90. Upon information and belief, AMC receive federal funding, including in the form of federal student loans given to students.

91. The procedural protections afforded respondents in sexual misconduct disciplinary proceedings are unfair and inadequate.

92. Sexual misconduct complainants at AMC may spend weeks, or even months, collecting evidence and constructing arguments before filing the complaint that initiates an investigation. They have the ability to structure that process around their academic and extracurricular commitments. Sexual misconduct respondents at AMC, by contrast, had no more than ten business days in which to review the documents in the investigative file, collect relevant evidence, and construct a defense.  They do not have the luxury of structuring that process around their academic or extracurricular commitments.

93. Sexual misconduct violations are more likely than others to result in the most serious sanctions AMC can impose.

94. Claims of sexual misconduct, more often than other claims, are decided solely or primarily on the basis of the parties' credibility, because sexual contact typically takes place in private.

95. This makes the assistance of lawyers, who are trained to recognize inconsistencies, factual errors and/or legal fallacies contained in a witness's testimony (usually on-the-spot) especially important in sexual misconduct disciplinary proceedings.  AMC's refusal to allow sexual misconduct respondents the effective assistance of a lawyer creates an imbalance of such significance that any Respondent is forever at a disadvantage.

96. Because sexual misconduct claims often turn on complicated issues of law and have such weighty consequences for the school, the accuser and the accused, any adjudication by members of the school is inherently biased and the accused is set up for failure.

97. For those reasons, respondents in sexual misconduct cases are entitled to greater procedural protections and more time to prepare a defense than respondents in other cases.

98. Respondents at AMC, however, are given no special procedural protections, are judged by a committee of biased administrators, and in both policy and by practice are held to a higher appellate standard than respondents in other types of disciplinary proceedings.

99. The vast majority of respondents in the AMC's sexual misconduct investigations and disciplinary proceedings are male.

100. AMC's inadequate investigative and adjudicative procedures therefore have a disparate impact upon male students.

101. AMC's inadequate and unfair hearing procedures directly and proximately prevented Plaintiff from mounting an effective defense to Jane Roe's complaint.

102. Accordingly, AMC is liable to Plaintiff for violation of Title IX, and for all damages arising out of that violation.

**COUNT VI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

103. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

104. The acts and omissions of the University and its investigators were willful and intentional.

105. AMC knew or should have known that the investigators' and hearing panel members' improper acts and omissions set forth above would cause plaintiff severe emotional distress.

106. AMC's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

107. AMC's conduct and that of the investigators was the direct and proximate cause of John's severe emotional distress, which includes symptoms of depression, extreme anxiety,

loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

108.  As a direct, proximate, and foreseeable consequence of the aforementioned conduct, plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

## PRAYER FOR RELIEF

1.  Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against Defendants, and order relief against the Defendants as follows:

    a.  That this Court issue preliminary and permanent injunctive relief restraining the Albany Medical College (1) from continuing to enforce any punishment against Plaintiff, including by allowing him to enroll at the school for the fall semester of 2017, and (2) from making any notation on Plaintiff's transcript, or keeping any record related to this disciplinary hearing in Plaintiff's educational records, as its sanctions were the product of an erroneous finding that Plaintiff violated the guidelines outlined in the Handbook, which was itself the product of a flawed disciplinary process.

    b.  That Albany Medical College be ordered to pay compensatory damages as appropriate to compensate Plaintiff for his losses caused by the school's misconduct, in the amount of $12,000,000; and

    c.  That Albany Medical College be ordered to pay punitive damages, in the amount of $3,000,000;

    d.  That Albany Medical College be ordered to pay all attorneys fees incurred in this action; and

19

e. That this Court award Plaintiff his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

## JURY DEMAND

2. Plaintiff demands a trial by jury as to all issues herein presented.

Dated: November 3, 2016

THE KINDLON LAW FIRM, PLLC

By: s/Lee C. Kindlon
Bar Number: 511642
*Attorney for Plaintiff*
74 Chapel Street
Albany, New York 12207
Telephone: (518) 434-1493
Fax: (518) 935-9336
E-mail: lkindlon@kindlon.com